1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  CHICO SCRAP METAL, INC., a        )  Case No. 2:11-CV-1201-JAM-CMK
    California corporation; GEORGE    )
12  W. SCOTT, SR., individually and   )  ORDER GRANTING THE DISTRICT
    as trustee of GEORGE W. SCOTT,    )  ATTORNEY DEFENDANTS' MOTION TO
13  SR. REVOCABLE INTER VIVOS TRUST   )  DISMISS PLAINTIFFS' AMENDED
    DATED SEPTEMBER 25, 1995,         )  COMPLAINT
14                                    )
                   Plaintiffs,        )
15                                    )
          v.                          )
16                                    )
    DEBBIE RAPHAEL, in her official   )
17  capacity as Director of           )
    California Department of Toxic    )
18  Substances Control; LEONARD       )
    ROBINSON, in his official         )
19  capacity as former Acting         )
    Director of the California        )
20  Department of Toxic Substances    )
    Control; RAYMOND LECLERC, in his  )
21  official capacity as the          )
    Assistant Deputy Director of      )
22  California Department of Toxic     )
    Substances; DIANE SHERIDAN, in    )
23  her official capacity as an       )
    employee of California            )
24  Department of Toxic Substances    )
    Control; NANCY LANCASTER, an      )
25  individual; SAMUEL MARTINEZ, JR,  )
    an individual; VIVIAN MURAI, an   )
26  individual; STEVEN BECKER, an     )
    individual; LEONA WINNER, an      )
27  individual; MICHAEL RAMSEY, in    )
    his official capacity as          )
28  District Attorney of Butte        )
                                      )

                                      1

1  County; HAROLD THOMAS, an          )
   individual; GEORGE BARBER, an     )
2  individual; and DOES 1-20,         )
   inclusive,                         )
3                                     )
                    Defendants.       )
4  _____)

5       This matter comes before the court on Defendants Michael

6  Ramsey in his official capacity, Harold Thomas in his individual

7  capacity, and George Barber in his individual capacity's

8  (collectively "Defendants") Motion to Dismiss First Amended

9  Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(1) and

10 (6) (Doc. #31).[1]  Plaintiffs Chico Scrap Metal, Inc., and George W.

11 Scott, Sr., individually and as trustee of the George W. Scott, Sr.

12 Revocable Inter Vivos Trust Dated September 25, 1995 (collectively

13 "Plaintiffs") oppose the motion ("Opposition") (Doc. #47).

14 Defendants filed a reply to Plaintiffs' opposition (Doc. #50).

15

16         I.   FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

17      This action arises out of state enforcement of hazardous waste

18 laws against Plaintiffs at four operating scrap metal facilities.

19 Defendants, all associated with the Butte County District

20 Attorney's Office, initiated an investigation and then allegedly

21 acted with the Department of Toxic Substances Control ("DTSC"),

22 members of which are also defendants in this action, to impose

23 clean-up requirements on Plaintiffs' four commercial properties.

24 Plaintiffs bring three causes of action against Defendants in their

25 First Amended Complaint ("FAC") (Doc. #17).  They seek

26 (1) injunctive relief and (2) damages pursuant to 42 U.S.C. § 1983.

27 _____

28 [1] This motion was determined to be suitable for decision without
   oral argument.  E.D. Cal. L.R. 230(g).  The hearing was originally
   scheduled for September 21, 2011.

1   Plaintiffs also seek (3) a declaration of the Defendants' legal

2   right to continue enforcing existing clean-up orders.

3       Beginning in 2007, DTSC working with Defendants investigated

4   Plaintiffs for various criminal violations related to the operation

5   of Chico Scrap Metal.  Plaintiffs allege that the investigation was

6   not intended to enforce California hazardous waste laws, but that

7   the investigation was instead intended to produce revenue for DTSC

8   and Defendants.  Plaintiffs also allege that the motivation for the

9   investigation was not to protect the public health or enforce the

10  law because the primary motivation was revenue generation through

11  the levying of fines and enforcement costs against Plaintiffs.

12      The investigation culminated in Plaintiffs' agreement to

13  several DTSC consent orders requiring compliance with a DTSC

14  monitored environmental remediation program.  Further, Defendants

15  filed criminal felony charges against Plaintiffs, leading to

16  Plaintiffs' pleas of nolo contendere in exchange for a plea

17  agreement.  The plea agreement between Plaintiffs and Defendants

18  referenced and incorporated the DTSC consent orders, requiring

19  compliance with them as a term of Plaintiffs' probation.

20      A.   Defendants' 2007 Investigation

21      In 2007, Defendants started investigating Plaintiffs'

22  business.  The first sample taken from Plaintiffs' property was

23  acquired by Defendant Barber and tested by DTSC.  Plaintiffs allege

24  that this sample, which was the basis for Defendants'

25  investigation, was taken without a proper sampling plan and was

26  tested improperly by DTSC.  Plaintiffs claim that the sample was

27  obtained through the reckless use of unsound testing methods in

28  order to yield evidence of waste, which was subsequently

1  mischaracterized as hazardous.  Plaintiffs allege the following

2  improprieties: (1) Defendants had no sampling plan; (2) Defendants

3  did not apply the proper scrap metal industry exemptions to the

4  sample; and (3) the testing performed on the samples was done

5  incorrectly.

6      B.  <u>The DTSC Orders and Plaintiffs' Criminal Conviction</u>

7      In 2008, both DTSC and Defendants carried out enforcement

8  actions against Plaintiffs.  After DTSC imposed an "Imminent

9  Endangerment Order" shutting down one of Plaintiffs' sites,

10  Plaintiffs agreed to consent orders that permitted DTSC to

11  investigate and monitor Plaintiffs' businesses.  The orders also

12  required Plaintiffs to pay fees and costs to DTSC.

13      In October, 2008, Plaintiffs pleaded nolo contendere to a

14  series of misdemeanors in state court pursuant to a plea agreement

15  with Defendants.  Defendants agreed to reduce all charges from

16  felonies to misdemeanors.  Plaintiffs agreed to pay $181,000 for

17  investigation and cleanup costs incurred by DTSC up to that point.

18  Further, Plaintiffs agreed to abide by the terms of the DTSC

19  orders.  Finally, Plaintiffs were fined $700,000 with $500,000

20  suspended pending successful completion of Plaintiffs' probation,

21  but no term of imprisonment was imposed.  While the plea agreement

22  incorporates the DTSC orders, DTSC was not a party to the plea

23  agreement.

24      C.  <u>Events Leading to the Present Litigation</u>

25      Plaintiffs allege that they began to question to necessity of

26  DTSC and Defendants' actions for a number of reasons.  First,

27  Plaintiffs hired an independent expert in 2009 who was a former

28  manager at the DTSC laboratory.  That expert allegedly identified

4

various deficiencies in the testing system used by DTSC on samples taken from Plaintiffs' properties.  Then, in 2010 and 2011, Plaintiffs allege that DTSC investigations at two out of four Chico Scrap Metal properties determined that no hazardous waste existed. Plaintiffs claim that DTSC was not willing to modify its orders, even though Plaintiffs' consultants determined that any problems that did exist could be managed by existing procedures at the sites.

DTSC subsequently reported to Defendants that Plaintiffs were no longer complying with the DTSC orders.  Rather than any concern with Plaintiffs' cleanup efforts, the alleged reason for DTSC's noncompliance report is that Plaintiffs objected to being double-billed by both DTSC and Defendants for the $181,000 in costs preceding the state court conviction.

Plaintiffs filed the present lawsuit to challenge the DTSC consent orders and the actions taken by all defendants leading up to those orders.  Plaintiffs do not plead claims arising from the plea agreement.

Defendants' response to Plaintiffs' allegations is emphatic: "This action arises out of the civil and criminal proceedings against Plaintiffs stemming from the finding of hazardous waste at all four of Plaintiffs' scrap metal sites in Butte County."  MTD, at 1.

II.  OPINION

A.  Legal Standard

A party may move to dismiss an action for failure to state a claim upon which relief can be granted pursuant to Federal Rule of

1    Civil Procedure 12(b)(6).  In considering a motion to dismiss, the

2    court must accept the allegations in the complaint as true and draw

3    all reasonable inferences in favor of the plaintiff.  <u>Scheuer v.</u>

4    <u>Rhodes</u>, 416 U.S. 232, 236 (1974), <u>overruled on other grounds by</u>

5    <u>Davis v. Scherer</u>, 468 U.S. 183 (1984); <u>Cruz v. Beto</u>, 405 U.S. 319,

6    322 (1972).  Assertions that are mere "legal conclusions," however,

7    are not entitled to the assumption of truth.  <u>Ashcroft v. Iqbal</u>,

8    129 S. Ct. 1937, 1950 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>,

9    550 U.S. 544, 555 (2007)).  To survive a motion to dismiss, a

10   plaintiff needs to plead "enough facts to state a claim to relief

11   that is plausible on its face."  <u>Twombly</u>, 550 U.S. at 570.

12   Dismissal is appropriate where the plaintiff fails to state a claim

13   supportable by a cognizable legal theory.  <u>Balistreri v. Pacifica</u>

14   <u>Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990).

15        Upon granting a motion to dismiss for failure to state a

16   claim, the court has discretion to allow leave to amend the

17   complaint pursuant to Federal Rule of Civil Procedure 15(a).

18   "Dismissal with prejudice and without leave to amend is not

19   appropriate unless it is clear . . . that the complaint could not

20   be saved by amendment."  <u>Eminence Capital, L.L.C. v. Aspeon, Inc.</u>,

21   316 F.3d 1048, 1052 (9th Cir. 2003).

22        B.   <u>Discussion</u>

23             1.   <u>Jurisdiction</u>

24        Defendants raise three jurisdictional doctrines in their

25   motion: the <u>Rooker-Feldman</u> doctrine, <u>Younger</u> abstention, and the

26   exhaustion requirement established by <u>Heck v. Humphrey</u>.  If any of

27   these doctrines applies to the claims before the Court, the Court

28   must grant Defendants' motion, or at least stay proceedings pending

1  resolution of the state court action.

2  a)  Heck v. Humphrey

3  Defendants argue that Plaintiffs' claims are barred by the

4  rule set forth in Heck v. Humphrey, 512 U.S. 477 (1994), because

5  Plaintiffs' success in this suit will call into question the

6  validity of their state law convictions.  MTD, at 5.  Plaintiffs

7  respond that success in this lawsuit does nothing to change the

8  state law convictions, as the conduct at issue here is distinct

9  from the state court criminal decisions.  Opp., at 8.

10  The Heck rule is simple: "if finding in favor of a § 1983

11  plaintiff would necessarily imply the invalidity of his conviction

12  or sentence the complaint must be dismissed."  Szajer v. City of

13  L.A., 632 F.3d 607, 611 (9th Cir. 2011) (quoting Heck, 512 U.S. at

14  486-87).

15  Defendants offer two cases to support the argument that

16  Plaintiffs' lawsuit calls into question the validity of Plaintiffs'

17  state court conviction.  First, they rely on Szajer.  MTD, at 9.

18  In Szajer, the plaintiffs were convicted of illegally possessing a

19  particular weapon in state court based on nolo contendere pleas.

20  Szajer, 632 F.3d at 609.  The only evidence supporting their

21  convictions was found when the police executed a search warrant at

22  the plaintiffs' business and home.  Id.  The plaintiffs did not

23  contest or question the legality of the searches during the course

24  of the state proceedings.  Id.  After entering their pleas, the

25  plaintiffs filed suit in federal court to recover damages for what

26  they alleged were illegal searches.  Id. at 609-10.  The court held

27  that declaring the search warrant invalid necessarily called into

28  question the state court conviction because there was no evidence

1  other than that recovered by the police during the execution of the

2  search warrant to support the charge that they illegally possessed

3  the weapon.  Id. at 612.  The Szajer court noted that the

4  plaintiffs did not provide "any other basis for the discovery of

5  the assault weapon found in their home, which formed the basis of

6  the plea conviction."  Id.

7       Plaintiffs in this case respond to Szajer by contending that

8  other evidence can provide a basis for their state court conviction

9  independently of the DTSC orders and investigation.  Opp., at 10.

10 This information includes admissions of Plaintiff Scott,

11 observations made by Defendant Barber, and allegations of unsafe

12 working methods used by Plaintiffs at one of their facilities.  Id.

13      Defendants next rely upon Price v. Schwarzenegger, 344 F.

14 App'x 375 (9th Cir. 2009).  In Price, the plaintiff brought a

15 federal action alleging denial of due process at a parole hearing

16 and in the imposition of a mandatory parole term.  Id. at 375.  The

17 court dismissed the claim challenging the mandatory parole term on

18 the grounds that the parole term was a statutorily required

19 consequence of the guilty plea in the prior state court proceeding.

20 Id. at 376.  Since the only way to avoid parole was to invalidate

21 the plea agreement itself, the court held that Heck barred the

22 federal court action.  Id.  Defendants rely on Price on the grounds

23 that the DTSC orders became a mandatory consequence of their plea

24 agreement, and, therefore, like Price, Plaintiffs' request to

25 invalidate the DTSC Order is barred by Heck.  Reply, at 4.

26      Plaintiffs respond to Defendants' arguments by claiming that

27 successfully challenging the DTSC Orders in this federal action

28 against Defendants will not change the status of their state court

convictions.  Plaintiffs argue that the state court conviction is based on their nolo contendere pleas, not the legal validity of the DTSC orders. Plaintiffs cite two Ninth Circuit cases in support of their argument that a conviction based on a nolo contendere plea does not in any way depend on the validity of the evidence underlying the conviction.  Lockett v. Ericson, — F.3d —, 2011 WL 3836467, at *4 (9th Cir. Aug. 31, 2011) (citing Ove v. Gwinn, 264 F.3d 817, 823 (9th Cir. 2001)). Plaintiffs' argument fails for two reasons.  First, in this case the DTSC orders are not evidence used to support the plea agreement, they are prospective requirements of the plea agreement and the state court terms of probation.  Second, permitting Defendants to challenge the DTSC orders in federal court would effectively invalidate the state court's mandate that Plaintiffs abide by the terms of those orders.  This is exactly the kind of action barred by Heck, and Lockett's holding is inapplicable to the facts of the present case.

Defendants' position is clearly supported by both Price and Szajer.  In Price, the "mandatory consequence" of the plaintiff's guilty plea, the term of parole, was deemed inseparable from the plea agreement.  Price, 344 F. App'x. at 376.  In this case, the terms of the DTSC orders are incorporated by reference in the plea agreement itself and are similarly inseparable.  In Price, invalidating the parole term also invalidated the plea agreement, and that is the functional effect in this case as well.  The DTSC orders are clearly a mandatory term of Plaintiffs' plea agreement. Heck, as explained by Szajer and Price, bars Plaintiffs' federal claims against Defendants.

Accordingly, the Court GRANTS Defendants' motion to dismiss on

1 these grounds.

2          a)    The Rooker-Feldman Doctrine & Younger

3                Abstention

4      Having granted dismissal on the basis of Heck v. Humphrey, the

5 Court need not reach Defendants' motion insofar as it relies on the

6 Rooker-Feldman doctrine and Younger abstention. The Court also

7 declines to reach Defendants' argument that Plaintiffs failed to

8 properly plead an equal protection claim.

9          2.   Defendants' Immunity

10     Defendants also seek dismissal claiming that they are immune

11 from suit. The Court will address each of the three immunities

12 raised by Defendants and finds, as an alternative ground for

13 dismissal, that Defendants have qualified immunity in this action.

14          a)    Absolute Immunity

15     Defendants argue that they are absolutely immune from suit

16 because prosecutors enjoy absolute immunity for actions taken as

17 officers of the court.  Plaintiffs respond that there is no

18 absolute immunity for Defendants' actions because Plaintiffs'

19 claims stem from two areas where absolute immunity is not

20 applicable: 1) giving advice to police during an investigation, and

21 2) making statements to the press.

22     Prosecutors are absolutely immune from liability under Section

23 1983 for their conduct in initiating a prosecution when the conduct

24 is intimately associated with the judicial phase of the criminal

25 process.  Burns v. Reed, 500 U.S. 478, 486 (1991) (internal

26 citations omitted).  Absolute prosecutorial immunity only extends

27 to suits for damages, it does not bar suits for prospective

28 injunctive relief. Supreme Court of Virginia v. Consumers Union of

                                    10

1   the United States, Inc., 446 U.S. 719, 736-37 (1980).[2]

2      The Ninth Circuit explained when absolute prosecutorial

3   immunity is applicable:

4          [T]he actions of a prosecutor are not absolutely
           immune merely because they are performed by a
5          prosecutor.  Prosecutorial immunity depends on the
           nature of the function performed, not the identity of
6          the actor who performed it.  Prosecutors are entitled
           to qualified immunity, rather than absolute immunity,
7          when they perform administrative functions, or
           investigative functions normally performed by a
8          detective or police officer.

9   Genzler v. Longanbach, 410 F.3d 630, 636 (9th Cir. 2005) (internal

10  citations omitted).  Since absolute immunity only applies when

11  prosecutors perform functions intimately associated with the

12  judicial process, it does not apply when prosecutors perform the

13  same function as police during the early stages of an

14  investigation, or when prosecutors hold a defamatory press

15  conference.  Id. at 637 (citing Buckley v. Fitzsimmons, 509 U.S.

16  259, 270 (1993)).

17     Defendants argue that once Defendant Barber collected a sample

18  from Plaintiffs property and it tested positive for hazardous

19  waste, probable cause existed and absolute immunity kicked in at

20  that point.  Defendants are incorrect, however, because there is no

21  bright line rule for when absolute immunity applies.  Genzler, 410

22  F.3d at 637 ("The analysis of whether prosecutorial acts constitute

23  _____

24  [2] Only defendants Barber and Thomas are sued for damages in
    Plaintiffs' first cause of action.  FAC, at 41.  Plaintiffs do,
    however, indicate that Defendant Ramsey "ratified" Defendants
25  Barber and Thomas's conduct.  FAC, at 42.  Plaintiffs have not
    clearly stated a claim against Mr. Ramsey, but even if they had, he
26  is immune from § 1983 liability because he is a state official and
    not a "person" for § 1983 purposes.  Weiner v. San Diego County,
27  210 F.3d 1025, 1031 (9th Cir. 2000) (holding that a district
    attorney is a state official when prosecuting a criminal violation
28  and is not subject to § 1983 liability).

1   advocacy or police-type investigative work is complicated by the

2   fact that the Supreme Court has resisted any attempt to draw a

3   bright-line between the two.").   The analysis focuses on the type

4   of activity performed and its relation to the judicial process.

5   Id. at 637-38.

6       In this case, Plaintiffs argue that Defendants do not enjoy

7   absolute immunity for the advice that they provided to DTSC.   The

8   allegation is that Defendant Barber assisted DTSC in investigating

9   Plaintiffs' assets and the best course of action to take in

10  assessing DTSC penalties, as distinct from the subsequent criminal

11  prosecution.   Opp., at 16.   The problem with Plaintiffs' position,

12  however, is that they do not indicate how giving advice to DTSC is

13  necessarily separate from the work Defendants did in preparing

14  their own criminal prosecution of Plaintiffs.   While it is true

15  that establishing probable cause does not necessarily establish

16  absolute prosecutorial immunity, in this case Defendants were

17  engaging in their own prosecution.   Plaintiffs do not cite

18  authority that suggests that sharing resources and recommendations

19  with a state regulatory agency, DTSC, is grounds upon which

20  absolute immunity can be denied or waived.

21      The proper inquiry is instead whether or not Defendants'

22  investigatory work "is of the type normally done by police . . . or

23  whether an investigation is bound up with the judicial

24  process . . . ."   Genzler, 410 F.3d at 638.   In the present case,

25  Defendants clearly explain that they were working with DTSC in an

26  investigatory capacity to gather evidence prior to the December 2007

27  to January 2008 period, when the decision to initiate criminal

28  prosecution was finally made.   MTD, at 1.   Defendants agree that

1  they spent over 40 hours planning the execution of a search warrant

2  on Plaintiffs' properties and conducting an asset search on

3  Plaintiffs. Id. These actions give rise to Plaintiffs' claims, not

4  the later decision to initiate a criminal prosecution. Considering

5  that the decision to prosecute either civilly or criminally was not

6  made until after the execution of the search warrant (MTD, at 1),

7  Defendants' investigatory efforts were too attenuated from the

8  judicial process to support absolute immunity.

9  Plaintiffs' complaint alleges that Defendants engaged in

10 police-like investigatory actions prior to initiating judicial

11 proceedings. Absolute prosecutorial immunity does not extend to

12 such actions. Defendant Ramsey has been sued only in his official

13 capacity for injunctive relief, and absolute immunity does not

14 limit that claim. FAC, at 42; Supreme Court of Virginia, 446 U.S.

15 at 736-37. Accordingly, Defendants' motion to dismiss on these

16 grounds is DENIED.

17            b)    Sovereign Immunity

18 Defendants also argue that Plaintiffs' second claim for relief

19 against Defendant Ramsey in his official capacity is barred by the

20 11th Amendment to the United States Constitution.

21 Prospective injunctive relief against state officials in their

22 official capacity is not prohibited by the 11th Amendment. Edelman

23 v. Jordan, 415 U.S. 651, 664 (1974) (citing Ex parte Young, 209

24 U.S. 123 (1908)). Retroactive equitable relief which is the

25 equivalent of requiring a payment made out of the state treasury is

26 barred by the 11th Amendment, but prospective injunctive relief is

27 not. Id. at 668-69.

28 In this case, Plaintiffs seek to enjoin enforcement of the

1  DTSC Orders prospectively, which will not require any payment from

2  the state treasury.  The 11th Amendment does not bar this claim.

3                    c)   Qualified Immunity

4        Defendants finally argue that they are immune from suit in

5  this instance because of qualified immunity.  Plaintiffs respond

6  that there was no rational basis for Defendants' decision to

7  investigate Plaintiffs' property for hazardous substances, making

8  qualified immunity inapplicable.

9        The doctrine of qualified immunity shields public officials

10 sued in their individual capacity from monetary damages, unless

11 their conduct violates "clearly established" law that would be

12 known to a reasonable public officer.  Saucier v. Katz, 533 U.S.

13 194, 199 (2001).

14       The Court must make a two-step inquiry in deciding the issue

15 of qualified immunity.  Saucier, 533 U.S. at 200. First, the court

16 must determine whether, under the facts alleged, taken in the light

17 most favorable to the plaintiff, a violation of a constitutional

18 right occurred.  Id.  If so, the court must then ask whether the

19 constitutional right was clearly established at the time of the

20 violation.  Id.

21       Initially, the Supreme Court in Saucier held that these two

22 inquiries must be decided in rigid order.  Saucier, 533 U.S. at

23 200.  That is, a district court had to resolve whether a violation

24 of a constitutional right occurred before it could evaluate whether

25 the right was clearly established.  Recognizing, however, that

26 "there are cases in which it is plain that a constitutional right

27 is not clearly established but far from obvious whether in fact

28 there is such a right," the Supreme Court recently relaxed the

14

1  order of analysis.  Pearson v. Callahan, 555 U.S. 223, 237 (2009).

2  In Pearson, the Court held that the Saucier analysis may be

3  addressed in either order if the second step is clearly dispositive

4  and can address the matter efficiently.  Id. at 241-42.

5      In this case, the parties do not dispute that Plaintiffs'

6  allegations concern a clearly established constitutional right:

7  violation of the 14th Amendment's guarantee of equal protection.

8  The Court is only left with deciding whether or not Plaintiffs

9  adequately allege an actual violation of that right.

10     Plaintiffs claim that the DTSC investigation, assisted and

11 encouraged by Defendants, had no rational basis.  Opp., at 19.

12 Plaintiffs allege that DTSC neither produced evidence to support a

13 rational basis for the investigation of Plaintiffs' properties, nor

14 did they show that other similarly situated scrap metal facilities

15 were also investigated.  Id.  Plaintiffs' claim is that they, as a

16 class of one, were intentionally treated differently from other

17 scrap yards.  Id. at 20.  Defendants respond that the sample

18 obtained by Defendant Barber from Plaintiffs' property that tested

19 positive for hazardous waste according to the DTSC provided the

20 rational basis for the investigation.  MTD, at 15.  Further,

21 Defendants argue that merely pointing out that other scrap metal

22 facilities were not investigated is insufficient to show an equal

23 protection violation.  Id. at  15-16.

24     A valid class of one claim arises where an entity can show

25 that it has been "intentionally treated differently from others

26 similarly situated and there is no rational basis for the

27 difference in treatment."  Vill. of Willowbrook v. Olech, 528 U.S.

28 562, 564 (2000).

1   Plaintiffs did not adequately plead that Defendants violated
2   their right to equal protection, and the arguments in their briefs
3   indicate that they may not be able to.  Plaintiffs' Opposition, for
4   example, focuses on DTSC's actions because this suit does not
5   challenge Plaintiffs' criminal conviction, for which Defendants are
6   responsible.  It was, Plaintiffs allege, DTSC that failed to
7   properly test materials retrieved from Plaintiffs' properties.
8   Defendants merely "assisted and encouraged" DTSC.  Opp., at 19.
9   Plaintiffs also argue, in an attempt to overcome the <u>Heck</u> bar
10  discussed above, that Defendants based their investigation and
11  prosecution on other evidence including Defendant Barber's
12  observations and Plaintiff Scott's own admissions.  If the DTSC
13  testing did not provide a rational basis for Defendants'
14  investigation, then this other information did.  Plaintiffs pleaded
15  their equal protection claim in an attempt to win the <u>Heck</u> battle,
16  but as a result they lose the war.
17      It is also meaningful that Plaintiffs do not allege that any
18  other similarly situated scrap metal facility tested positive for
19  hazardous waste.  It is not enough for Plaintiffs to allege that
20  other scrap metal facilities are not subject to DTSC enforcement
21  actions.  They must also allege that these other scrap metal
22  facilities tested positive for hazardous waste and despite that,
23  Defendants chose to only investigate Plaintiffs.  "To succeed,
24  plaintiffs must demonstrate that they were treated differently than
25  someone who is prima facie identical in all relevant respects[,]"
26  but they have not done that.  <u>Occhionero v. City of Fresno</u>, No.
27  CV F 05-1184 LJO SMS, 2008 WL 2690431, at *9 (E.D. Cal. July 3,
28  2008) (internal quotations omitted).

16

1     The Court finds that Plaintiffs' allegations indicate that
2   there was a rational basis for Defendants' investigation.
3   Defendants are alleged to have relied on the DTSC testing and other
4   independent evidence to support their investigation.  Further,
5   Plaintiffs have not pleaded that any other similarly situated scrap
6   metal facility was not investigated despite testing positive for
7   hazardous waste.  Accordingly, the motion to dismiss the claims
8   against Defendants in their individual capacities is also GRANTED
9   on the alternative grounds that Defendants have qualified immunity
10  from suit.

11

12

13                              III. ORDER

14       For all the foregoing reasons, it is hereby ordered that all
15  of Plaintiffs' claims against Defendants are dismissed with
16  prejudice.

17

18       IT IS SO ORDERED.
19  Dated:  November 22, 2011
20                                  JOHN A. MENDEZ,
                                    UNITED STATES DISTRICT JUDGE
21

22

23

24

25

26

27

28